1  Bradley L. Cohn, Esq.
2  Phillip Barengolts, Esq.
   Elisabeth K. O'Neill, Esq.
3  Andrew R.W. Hughes, Esq.
   PATTISHALL, MCAULLIFFE, NEWBURY,
   HILLIARD & GERALDSON LLP
4  200 South Wacker Drive, Suite 2900
   Chicago, Illinois 60606
5  Telephone: (312) 554-8000

6  Brent H. Blakely (SBN 157292)
   bblakely@blakelylawgroup.com
7  Cindy Chan (SBN 247495)
   cchan@blakelylawgroup.com
8  Courtney L. Stuart-Alban (SBN 225513)
   cstuartalban@blakelylawgroup.com
9  BLAKELY LAW GROUP
   1334 Parkview Avenue, Suite 280
10 Manhattan Beach, California 90266
   Telephone: (310) 546-7400
11

12 *Attorneys for Plaintiffs*
   *Bayer Consumer Care AG and Bayer Healthcare, LLC.*

13              UNITED STATES DISTRICT COURT

14           SOUTHERN DISTRICT OF CALIFORNIA

15  BAYER CONSUMER CARE AG, a              ) CASE NO. CV
    Delaware Limited Liability Company;    )
16  BAYER HEALTHCARE LLC,                  )
                          Plaintiffs,      ) **COMPLAINT FOR DAMAGES:**
17                                         )
              v.                           ) **1. UNFAIR COMPETITION IN**
18                                         )    **VIOLATION OF SECTION 43(A)**
    BELMORA, LLC, a Virginia Limited       )    **OF THE LANHAM ACT;**
19  Liability Company; JAMIE BELCASTRO,    )
    an individual; and DOES 1-10, inclusive, ) **2. FALSE ADVERTISING IN**
20                                         )    **VIOLATION OF SECTION 43(a)**
              Defendants.                  )    **OF THE LANHAM ACT;**
21                                         )
                                           ) **3. UNFAIR COMPETITION IN**
22                                         )    **VIOLATION OF CALIFORNIA**
                                           )    **BUSINESS & PROFESSIONS**
23                                         )    **CODE § 17200, ET SEQ.;**
                                           )
24                                         ) **4. FALSE ADVERTISING IN**
                                           )    **VIOLATION OF CALIFORNIA**
25                                         )    **BUSINESS & PROFESSIONS**
                                           )    **CODE § 17500, ET SEQ.;**
26                                         )
                                           ) **5. UNFAIR COMPETITION IN**
27                                         )    **VIOLATION OF CALIFORNIA**
                                           )    **COMMON LAW**
28                                         )
                                           )    **JURY TRIAL DEMANDED**

Plaintiffs Bayer Consumer Care AG and Bayer Healthcare, LLC, allege as follows:

## PARTIES

1.     Plaintiff Bayer Consumer Care AG is a Swiss corporation with its principal place of business at Peter Merian-Str. 84, Basel, Switzerland 4052.

2.     Plaintiff Bayer Healthcare LLC, is a Delaware limited liability company with its principal place of business at 100 Bayer Boulevard, Whippany, New Jersey 07981.

3.     Plaintiffs are both part of the Bayer family of companies, under the aegis of Bayer AG.

4.     Defendant Belmora, LLC, is a Virginia limited liability company located and doing business at 1805 Crystal Drive, Unit 303, Arlington, Virginia 22202 ("Belmora").

5.     On information and belief, Defendant Jamie Belcastro is an individual residing at 140 N. Park Drive, Arlington, Virginia 22203 ("Belcastro").

6.     Belcastro is the owner and manager of Belmora.  Belmora has no other members and no employees.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction because this action arises under the Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051-1141 (the "Lanham Act"), and jurisdiction is proper in accordance with 15 U.S.C. § 1121 and 28 U.S.C. §§ 1338(a) and (b).  Jurisdiction for the California statutory and common law claims is proper in accordance with the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

8.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS

COMPLAINT FOR DAMAGES

## Bayer Consumer Care AG and its FLANAX Brand

9.     Since the 1970s, Bayer Consumer Care and its predecessors and licensees (collectively, "Bayer Consumer Care") have marketed and sold analgesics, which are pain relief medicines, in Mexico under the registered trademark FLANAX.  The active ingredient in Bayer Consumer Care's FLANAX medicine is naproxen sodium.

10.     Bayer Consumer Care's FLANAX mark has been known in the U.S. pharmaceutical community since at least 1996.

11.     Bayer Consumer Care has sold hundreds of millions of dollars of its FLANAX medicines in Mexico.  This includes substantial sales in major cities near the U.S.-Mexico border.

12.     Bayer Consumer Care has spent millions of dollars promoting and advertising the FLANAX brand in Mexico, including in major cities near the U.S.-Mexico border.

13.     As a result of Bayer Consumer Care's extensive sales and marketing, the FLANAX brand is extremely well known in Mexico and to Mexican-American consumers in the United States.

## Bayer Healthcare LLC and its ALEVE Brand

14.     Since 1988, Bayer Healthcare LLC, and its predecessors (collectively, "Bayer Healthcare") have marketed and sold analgesics in the United States under the registered trademark ALEVE.  Like FLANAX, the active ingredient in ALEVE is naproxen sodium.

15.     Bayer Healthcare has sold hundreds of millions of dollars of its ALEVE medicine in the United States.

16.     Bayer Healthcare has spent tens of millions of dollars promoting and advertising the ALEVE brand in the United States.

17.     FLANAX and ALEVE analgesics are marketed with a coordinated marketing strategy, and the same person within the Bayer family of companies is responsible for the marketing and sale of both medicines.

<u>Belmora and its Unauthorized Use of the FLANAX Mark</u>

18.     In 2003, Belmora applied to the United States Patent and Trademark Office to register the trademark FLANAX on an intent-to-use basis in 2003 for "Orally ingestible tablets of Naproxen Sodium for use as an analgesic." Application Serial No. 78/310,029. The trademark was registered in February 2005 and claimed a date of first use in United States commerce of March 1, 2004.

19.     Belmora's decision to use the FLANAX trademark was made by Belcastro.

20.     Belmora's FLANAX analgesics compete directly with Bayer Healthcare's ALEVE analgesics.

21.     In addition to using Bayer Consumers Care's FLANAX mark, Belmora adopted packaging for its FLANAX analgesics that was virtually identical to Bayer's FLANAX packaging.

22.     The FLANAX packaging Bayer Consumer Care's predecessor-in-interest used in Mexico for 275 mg tablets at the time Belmora began selling its FLANAX analgesics appears below:



23.     An early version of packaging for Belmora's 220 mg tablets of FLANAX analgesics is shown below:



24.     Like Bayer Consumer Care's packaging, Belmora's packaging displayed the mark FLANAX in white text on a sky-blue background with horizontal blue and white stripes at the bottom front of the package.  Belmora's packaging used the same font and typeface for the mark FLANAX as did Bayer Consumer Care's, with the letters getting progressively thinner from F to X.  Belmora used packaging that, like Bayer Consumer Care's Mexican FLANAX packaging, displayed the ® symbol, even though Belmora had not yet obtained a federal registration for the trademark FLANAX.

25.     This packaging was made by or at the direction of Belcastro.

26.     On information and belief, Belmora has since changed its packaging, although its modified packaging continues many of the same visual themes as the packaging shown above, and Belmora continues to use the FLANAX trademark.

27.     On information and belief, Belmora has since expanded its line of FLANAX products to include liniment, cough lozenges, and antacids, all sold under the FLANAX trademark.

28.     On information and belief, Belmora began selling its FLANAX medicine in geographic areas with high Mexican-American populations, including California.

29.     Belmora's FLANAX medicine has appeared on the shelves in the same store as gray market packages of Bayer's FLANAX medicine in Orange County, California, and possibly elsewhere.

<u>Defendants' Deceptive Marketing of Belmora's FLANAX Products</u>

30.     Defendants have marketed Belmora's FLANAX products by targeting Hispanic consumers likely to be familiar with Bayer Consumer Care's FLANAX products and deliberately attempting to deceive those consumers into believing that Belmora's FLANAX products are the same thing as the FLANAX medicines they know and trust from Mexico.

31.     One early Belmora marketing piece, translated from Spanish, stated: 'Flanax products are made with safe and effective ingredients that have been used for many, many years in Mexico, Central, and South America.  And now Belmora LLC is producing them in the United States."  Exhibit A, attached hereto.

32.     Another marketing piece, developed in 2007 when Belmora had been selling its FLANAX analgesics for ***only three years***, proclaimed:

> ***For generations***, Flanax has been a brand that Latinos have turned to for various common ailments.  Now you too can profit from this highly recognized [sic] top-selling brand among Latinos.  Flanax is now made in the U.S. . . . . Flanax acts as a powerful attraction for Latinos by providing them with products they know, trust and prefer. . . . With the Flanax

6

family of brands on your shelf, Latinos will know where to go to find the brand they trust.  Flanax products are packaged with bilingual text and the prominent Flanax logo your customers recognize.

Exhibit B, attached hereto (emphasis added).  Defendants sent this brochure to thousands of distributors and potential distributors throughout the United States, including, on information and belief, to distributors and potential distributors in California.

33.    Additionally, Defendants hired telemarketers to call potential distributors and read a script which suggested that Belmora's FLANAX products were the same as the FLANAX products sold in Mexico by Bayer Consumer Care.

34.    Defendants have made similarly misleading claims directly to distributors and potential distributors of Belmora's FLANAX products.

35.    Defendants initially targeted their marketing towards retailers in predominantly Hispanic communities.  As Belmora's sales expanded into major chain retailers such as Wal-Mart, Walgreens, and Circle K, Defendants remained focused on targeting Hispanic consumers likely to be familiar with Bayer Consumer Care's well-known FLANAX analgesics.

36.    These claims cause, have caused, and are likely to cause consumers to believe that Belmora's FLANAX products are or are related to Bayer Consumer Care's FLANAX analgesics that are well-known in Mexico and to Mexican-American consumers.

37.    These claims were made by, or at the direction of, Belcastro.

Defendants' Deceptive Marketing Has Caused Actual Confusion

38.    Defendants' deceptive marketing strategy has deceived numerous distributors, vendors, and even Belmora's own marketers into believing that Belmora's FLANAX products are, or are affiliated with, Bayer Consumer Care's FLANAX analgesics.

39.     For example, one of Belmora's online retailers, MexGrocer of San Diego, California, created a web page for Belmora's FLANAX products which referred to Belmora as "una empresa del grupo BAYER Health Care," which translates roughly to "a Bayer Health Care company." The MexGrocer page for Belmora's FLANAX analgesics initially also included a detailed history of Bayer'sFLANAX brand in Spanish. The history included phrases roughly translated as "Flanax launched in 1976"; "In 2001, the sale of non-prescription Flanax was authorized in Mexico"; and "In January 2005, Bayer of Mexico acquired Flanax."

Prior Cancellation Action

40.     In June 2007, Bayer Consumer Care petitioned the Trademark Trial and Appeal Board ("TTAB") to cancel Belmora's registration for the trademark FLANAX on the ground that  Belmora misrepresented the source of its products as coming from Bayer, in violation of 15 U.S.C. § 1604(3).

41.     During discovery in that case, Bayer uncovered substantial evidence that Belmora and Belcastro used deceptive marketing materials and communications to purposefully mislead consumers, including consumers in California, into believing that Belmora's FLANAX medicine was the same as Bayer Consumer Care's well-known FLANAX medicine.

42.     On April 17, 2014, the TTAB issued a ruling cancelling Belmora's FLANAX trademark registration pursuant to 15 U.S.C. § 1064(3). The TTAB's Decision ("Decision") is attached hereto as Exhibit C.

43.     Finding that the facts before them "do not present a close case," the TTAB concluded that, "[t]he preponderance of the evidence before us readily establishes blatant misuse of the FLANAX mark in a manner calculated to trade in the United States on the reputation and goodwill of [Bayer Consumer Care's] mark created by its use in Mexico." Decision, p.21.

44.     As the TTAB found, Belmora "knowingly selected the identical mark FLANAX, used by [Bayer Consumer Care's] Mexican licensee on naproxen sodium-

8

based painkillers, for use in the United States on the same type of goods." Decision, p.23.

45.     The TTAB also found that Belmora "copied [Bayer Consumer Care's] FLANAX logo as used in Mexico . . . and other elements of [Bayer Consumer Care's] Mexican packaging." Decision, p. 23.

46.     The TTAB further found that Belmora's "owner and agents repeatedly invoked the reputation of [Bayer Consumer Care's] FLANAX mark when marketing [Belmora's] FLANAX product in the United States." Decision, p. 24.

47.     As a result, the TTAB concluded: "[W]e have no doubt that retail customers and consumers exposed to [Belmora's marketing materials] would draw the logical conclusion that [Belmora's] U.S. product is licensed or produced by the source of the same type of product sold under the FLANAX brand for decades south of the border. . . . Nor do we have any doubt based on the record that [Belmora] deliberately and intentionally encouraged its customers to reach such a conclusion." Decision, pp. 25-26.

48.     In sum, the TTAB found that Belmora "built its business on this heritage of misrepresentation, and [Bayer Consumer Care] suffers damage today due to [Belmora's] continued use of the identical FLANAX mark on the same type of product." Decision, p. 30.

**COUNT I**

**UNFAIR COMPETITION**

**<u>IN VIOLATION OF SECTION 43(a) OF THE LANHAM ACT, 15 U.S.C. §</u>**

**<u>1125(a)</u>**

49.     Bayer Consumer Care re-alleges paragraphs 1 through 48, as if fully alleged herein.

50.     Defendants' aforesaid use of FLANAX and deceptive marketing materials falsely represent that Belmora is affiliated, connected, or associated with, or sponsored

or approved by Bayer Consumer Care in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

51.   Defendants' aforesaid use of FLANAX and deceptive marketing materials falsely represent the nature, character, and/or qualities of their goods, services, and commercial activities in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

52.   Defendants' acts greatly and irreparably damage and will continue to so damage Bayer Consumer Care unless restrained by this Court; wherefore, Bayer Consumer Care is without an adequate remedy at law.

**COUNT II**

**FALSE ADVERTISING**

**IN VIOLATION OF SECTION 43(a) OF THE LANHAM ACT, 15 U.S.C. § 1125(a)**

53.   Plaintiffs re-allege paragraphs 1 through 48, as if fully alleged herein.

54.   Defendants' claims in their marketing materials and communications with distributors and potential distributors that Belmora's FLANAX products are the same as Bayer Consumer Care's FLANAX products, as well as Defendants' use of the FLANAX mark for naproxen sodium products (the "Claims"), are false and/or misleading statements of fact.

55.   The Claims have actually deceived, have the tendency to deceive, and/or are likely to deceive consumers.

56.   The resulting deception caused by the Claims is material, in that the Claims are likely to influence the purchasing decisions of purchasers of naproxen sodium products.

57.   Defendants' Claims have been with the intent to usurp Bayer Consumer Care's goodwill in an effort to compete unfairly against, among others, Bayer Healthcare and its ALEVE products.

58.     Defendants' aforesaid Claims constitute false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

59.     Defendants' acts greatly and irreparably damage and will continue to so damage Plaintiffs unless restrained by this Court; wherefore, Plaintiffs are without an adequate remedy at law.

**COUNT III**

**UNFAIR COMPETITION**

**IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §**

**17200, et seq.**

60.     Plaintiffs re-allege paragraphs 1 through 48, as if fully alleged herein.

61.     Defendants have falsely represented that Belmora's FLANAX products are the same as the Mexican FLANAX products familiar to many California consumers.  By these misrepresentations, Defendants have deceived consumers into believing that Belmora or its FLANAX products are, or are affiliated with, Bayer Consumer Care and its FLANAX products.

62.     In so doing, Defendants have traded on the goodwill of Bayer Consumer Care's FLANAX mark in Mexico and to Mexican-American consumers to compete unfairly against Bayer Healthcare's ALEVE products in the United States.

63.     Defendants' aforesaid acts constitute "unlawful, unfair or fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising" in violation of California Business and Professions Code § 17200, *et seq.*

64.     Defendants' acts greatly and irreparably damage and will continue to so damage Plaintiffs unless restrained by this Court; wherefore, Plaintiffs are without an adequate remedy at law.

**COUNT IV**

**FALSE ADVERTISING**

**IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §**

**17500, et seq.**

65.     Plaintiffs re-allege paragraphs 1 through 48, as if fully alleged herein.

66.     Defendants' Claims are false and/or misleading statements of fact that Defendants know to be false and/or misleading.

67.     The Claims are untrue, have actually deceived, have the tendency to deceive, and/or are likely to deceive consumers.

68.     Defendants' misrepresentations have been with the intent to usurp Bayer Consumer Care's goodwill in an effort to compete unfairly against, among others, Bayer Healthcare and its ALEVE products.

69.     Defendants' aforesaid misrepresentations constitute false advertising in violation of California Business and Professions Code §§ 17500 and 17505.

70.     Defendants' acts greatly and irreparably damage and will continue to so damage Plaintiffs unless restrained by this Court; wherefore, Plaintiffs are without an adequate remedy at law.

**COUNT V**

**UNFAIR COMPETITION**

**<u>IN VIOLATION OF CALIFORNIA COMMON LAW</u>**

71.     Plaintiffs re-allege paragraphs 1 through 48, as if fully alleged herein.

72.     Defendants' acts constitute unfair competition in violation of the common law of the State of California.

73.     Defendants intentionally have traded upon and unfairly benefited from Bayer Consumer Care's valuable goodwill, reputation, and substantial marketing in order to compete unfairly with Bayer Healthcare and have been unjustly enriched thereby.

74.     Defendants has misappropriated for themselves the commercial value of the FLANAX mark in conscious disregard of Bayer Consumer Care's rights and have greatly impaired the value of Bayer Consumer Care's goodwill in this mark among American consumers.

75.     In conducting such acts, Defendants are guilty of oppression, fraud and/or malice, as defined in Cal. Civ. Code § 3294.

76.     Defendants' acts greatly and irreparably damage and will continue to so damage Plaintiffs unless restrained by this Court; wherefore, Plaintiffs are without an adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

1.     Defendants, and their officers, agents, servants, employees, attorneys, and all others in active concert and participation with any of them, individually and collectively, be permanently enjoined from:

a)     using the trademark FLANAX and any trademarks confusingly similar thereto;

b)     using any trademark or trade dress owned by Plaintiffs or any colorable imitation of such trademarks or trade dress, or any other trademark in a manner that is likely to confuse, mislead, or deceive others into believing that Belmora or its products emanate from, or are connected with, sponsored by or approved by Plaintiffs or any of Plaintiffs' affiliated companies;

c)     doing any other act or thing likely to confuse, mislead or deceive others into believing that Belmora or the goods and services sold, distributed, or emanating from properties under Belmora's control are connected with, sponsored by or approved by Plaintiffs or any of Plaintiffs' affiliated companies; and

d)     assisting, aiding, or abetting any other person or entity in engaging in any of the activities prohibited in paragraphs (a) through (c).

2.     Defendants, and all others holding by, through, or under Defendants, be required, jointly and severally, to:

a)     account for and pay over to Plaintiffs all profits derived by Defendants, together with prejudgment interest, from its acts complained of herein in

1    accordance with 15 U.S.C. § 1117(a) and Plaintiffs ask that this profits award be

2    trebled in accordance with 15 U.S.C. § 1117(a);

3             b)      pay to Plaintiffs the amount of actual damages suffered by Plaintiffs

4    together with prejudgment interest, as a result of Defendants' acts complained of

5    herein in accordance with 15 U.S.C. § 1117(a) and the laws of the State of California

6    and Plaintiffs ask that this damages award be trebled in accordance with 15 U.S.C. §

7    1117(a);

8             c)      pay to Plaintiffs the costs of this action, together with reasonable

9    attorneys' fees, in accordance with 15 U.S.C. § 1117(a) and California Civil Procedure

10   Code § 1021.5;

11            d)      pay to Plaintiffs exemplary and/or punitive damages by reason of

12   Defendants' acts of unfair competition, in accordance with Cal. Civ. Code § 3294 and

13   common law of California;

14            e)      deliver up for destruction all labels, signs, advertisements and the

15   means of making the same in Defendants' possession which bear the FLANAX

16   trademark or any name, mark, or trade dress that simulates the FLANAX trademark

17   and trade dress and/or any other mark owned by Plaintiffs and their affiliated

18   companies in accordance with 15 U.S.C. § 1118; and

19            f)       file with this Court and serve on Plaintiffs a report in writing under

20   oath setting forth in detail the manner and form in which they have complied with the

21   terms of any injunction entered by this Court, in accordance with 15 U.S.C. § 1116(a).

22       3.       Plaintiffs be granted such other and further relief as the Court deems just.

23

24   DATED:      June 6, 2014          BLAKELY LAW GROUP

25

26                                    By: _____

27                                        Brent H. Blakely
                                          Cindy Chan
                                          Courtney L. Stuart-Alban
28                                        *Attorneys for Plaintiffs Bayer Consumer
                                          Care AG and Bayer Healthcare, LLC*

1

## **DEMAND FOR JURY TRIAL**

2      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Bayer

3  Consumer Care AG and Bayer Healthcare, LLC hereby demands a trial by jury as to

4  all claims in this litigation.

5

6  Dated:  June 6, 2014                    BLAKELY LAW GROUP

7

8                                         By:  _____

9                                              Brent H. Blakely
                                               Cindy Chan
10                                             Courtney L. Stuart-Alban
                                               *Attorneys for Plaintiffs Bayer Consumer*
11                                             *Care AG and Bayer Healthcare, LLC*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES**



¡Llamada hoy para poner su orden de Flanax!

Phone: 1-888-470-1526 Extension 2

## ¡¡Llene su caja registradora con ventas de Flanax!!

¡¡Llene su caja registradora con ventas de Flanax!!



Los productos Flanax están hechos con ingredientes seguros y eficaces que se han venido usando desde hace muchísimos años en México, América Central y del Sur. Y ahora los está produciendo la firma Belmora LLC en los Estados Unidos.

La familia de productos Flanax se compone de las Tabletas Analgésicas Flanax, la Crema Analgésica Flanax, las Pastillas Flanax para la Tos y Flanax para el Dolor Estomacal.

### Tabletas Analgésicas Flanax

Las Tabletas Analgésicas Flanax son muy efectivas para eliminar el dolor y la inflamación y pueden usarse para la artritis, dolores de cabeza, de espalda y musculares, dolores de muelas, resfriados y fiebre. Seis de cada diez personas en su área van a sufrir algunos de estos síntomas este año y van a comprar las Tabletas Analgésicas Flanax si usted las tiene en existencia, ¡lo que representa más utilidades para usted! Las Tabletas Analgésicas Flanax se venden más que Dolofin y Dolo-Neurobion.

### Crema Analgésica Flanax

La Crema Analgésica Flanax está hecha con ingredientes naturales y es el analgésico de uso externo más potente que se puede adquirir en el mercado estadounidense. Usted puede sentir el efecto de la Crema Flanax para el Dolor con solo tocarla con la punta de los dedos. Se usa para aliviar los dolores de artritis, de espalda, magulladuras, torceduras y distensiones. Los consumidores también sienten un efecto calmante adicional cuando toman las Tabletas Analgésicas Flanax y luego se untan la Crema Analgésica Flanax. No existe una mejor combinación de productos para el dolor que las Tabletas Analgésicas Flanax combinadas con la Crema Analgésica Flanax. Sus clientes seguirán viniendo a su tienda después que les recomiende usar las Tabletas Analgésicas Flanax junto con la Crema Flanax para calmar sus achaques.

### Flanax para el Dolor Estomacal

Flanax para el Dolor Estomacal neutraliza rápidamente los ácidos del estómago, y además contiene un ingrediente para eliminar el gas. Flanax para el Dolor Estomacal se usa para aliviar el ardor de estómago, la indigestión ácida y el gas. Cuatro de cada diez personas en su área experimentarán estos síntomas en algún momento del año y van a comprar Flanax para el Dolor Estomacal si usted lo lleva en su tienda. Flanax para el Dolor Estomacal neutraliza el ácido estomacal, eliminando rápidamente el ardor del estómago.

Bayer v. Belmora
Cancellation No. 92047741
Petitioner's Exhibit

EXHIBIT 272

BEL04014



**EXHIBIT A**

**Pastillas Flanax para la Tos**

¡Las Pastillas Flanax para la Tos contienen 8 mg de mentol!  La mayoría de las pastillas para la tos no contienen tanto mentol, siendo esa la razón por la cual las Pastillas Flanax para la Tos son tan efectivas. ¡Cuando sus clientes tienen dolor de garganta, ningún remedio surte mejor efecto que las Tabletas Analgésicas Flanax y las Pastillas Flanax para la Tos tomadas en combinación! Simplemente dígale a sus clientes que las Tabletas Analgésicas Flanax y las Pastillas Flanax para la Tos les van a aliviar su dolor de garganta en unos pocos días, y verá cómo regresan a su tienda porque usted les recomendó productos que les curaron sus dolencias.

Comience a llenar su caja registradora con dinero de las ventas de Flanax llamando a Belmora LLC al 1-888-470-1526, para que les entreguen los productos Flanax directamente en su tienda. Todo lo que tiene que hacer para llenar su caja registradora con dinero de las ventas de Flanax es pedir los productos Flanax y asegurarse que sus clientes sepan que usted los vende en su tienda.

| Nombre del producto | Caja de | Precio por pieza | Precio de venta sugerido |
|---|---|---|---|
| Tabletas Analgésicas Flanax | 12 piezas | $3.50 | $5.99-$6.99 |
| Crema Analgésica Flanax | 12 piezas | $4.25 | $7.99-$8.99 |
| Flanax para el Dolor Estomacal | 12 piezas | $3.50 | $5.99-$6.99 |
| Pastillas Flanax para la Tos | 12 piezas | $1.99 | $2.99 |

# ¡Llame hoy mismo al 1-888-470-1526 para colocar su pedido! ¡Aceptamos tarjetas de crédito y los envíos son GRATIS!

BEL04014.001



# Retail Rule #1
## Regla #1 del detallista

Sell what your customers want. Latino customers want Flanax!

Venda lo que quieren sus clientes. ¡Los clientes latinos quieren Flanax!

**▶ FLANAX®**
A TOP-SELLING BRAND THAT LATINOS KNOW AND TRUST IS NOW READY TO BE A TOP-SELLER IN YOUR STORE

UNA MARCA DE MUCHA VENTA QUE LOS LATINOS CONOCEN Y EN LA CUAL CONFÍAN YA ESTÁ LISTA PARA CONVERTIRSE EN PRODUCTO DE VENTA MÁXIMA EN SU TIENDA

**▶ Increase Customer Loyalty and Repeat Business** With the Flanax family of brands on your shelf, Latinos will know where to go to find the brand they trust. Flanax products are packaged with bilingual text and the prominent Flanax logo your customers recognize.

**Aumente la Lealtad de sus Clientes para que les Traigan Más Negocio** Con la familia de marcas Flanax en su anaqueles, los latinos sabrán a dónde ir para encontrar la marca en la cual confían. Los productos Flanax son empaquetados con texto en dos idiomas y el prominente logotipo de Flanax reconocido por sus clientes.

**Order now and receive a FREE Flanax Analgesic Tablets Counter Top Display***

**FREE Shipping to Your Store.**

SPECIAL OFFER FOR FIRST TIME BUYERS – ORDER TODAY or SAVE!

*offer valid with a minimum order of $155 in Flanax products.

Belmora, LLC, a U.S. company based in Virginia providing quality health care products since 1998. Belmora, LLC is committed to customer satisfaction and provides excellent support to all retailers and information to customers at our website www.medicoflanax.com

**▶ Increase Your Profits** For generations, Flanax has been a brand that Latinos have turned to for various common ailments. Now you too can profit from the highly recognized top-selling brand among Latinos. Flanax is now a record in the U.S. and continues to show record sales growth everywhere it is sold. Flanax acts as a powerful attraction for Latinos by providing them with products they know, trust and prefer.

**Aumente sus Utilidades** Durante generaciones, Flanax ha sido una marca que los latinos han buscado para Aliviar diversos achaques comunes. Ahora usted también puede beneficiarse de esta marca tan reconocida que compran mucho los latinos. Flanax ya se fabrica en los EE.UU. y continúa demostrando un crecimiento de ventas sin precedente en todas las tiendas donde se vende. Flanax actúa como una poderosa atracción para los latinos, pues les ofrece productos confiables que conocen y prefieren.

**▶ Proven Relief Without a Prescription** Flanax products provide relief for many common ailments and are made with safe and effective ingredients. Flanax is available over the counter (without a prescription), adding profit-building convenience.

**Alivio Comprobado sin Receta** Los productos Flanax alivian muchos malestares comunes, pues están hechos con ingredientes seguros y eficaces. Flanax se vende libremente (sin receta), lo que es más conveniente para obtener más utilidades.

**Call 1-888-470-1526 Ext 3 to place your order today!**
Llame hoy mismo al 1-888-470-1526 para colocar su pedido!




Belmora, LLC
Proud Makers of Flanax
Accountability and Customer Service You Can Count On.

**EXHIBIT B**

THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                    Mailed:
October 23, 2013                            April 17, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Bayer Consumer Care AG*
*v.*
*Belmora LLC*
_____

Cancellation No. 92047741
_____

Bradley L. Cohn, Phillip Barengolts, Alexis E. Payne, Ian J. Block, Scott T. Lonardo, Seth I. Appel, and Jeffrey A. Wakolbinger, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson LLP, for Bayer Consumer Care AG.

Marsha G. Gentner, Philip L. O'Neill, and Leesa N. Weiss, Jacobson Holman PLLC, for Belmora LLC.
_____

Before Seeherman, Taylor, and Hightower, Administrative Trademark Judges.

Opinion by Hightower, Administrative Trademark Judge:

Bayer Consumer Care AG petitions to cancel Belmora LLC's registration for the mark FLANAX, in standard characters, for "orally ingestible tablets of Naproxen Sodium for use as an analgesic" in International Class 5.[1]  Petitioner alleges that the registered mark is being used by the respondent to misrepresent

---

[1] Registration No. 2924440, issued February 1, 2005.  A declaration of use pursuant to Section 8 of the Trademark Act, 15 U.S.C. § 1058, was accepted December 16, 2010.

**EXHIBIT C**

Cancellation No. 92047741

the source of the goods on or in connection with which the mark is used pursuant to

Section 14(3) of the Trademark Act, 15 U.S.C. § 1064(3).

We grant the petition to cancel.

<u>Summary of Proceeding</u>

Petitioner filed a petition to cancel on June 29, 2007,[2] asserting a likelihood

of confusion. After respondent moved to dismiss for failure to state a claim under

FED. R. CIV. P. 12(b)(6), asserting that petitioner had not properly alleged standing

or prior use in the United States, petitioner amended its pleading to allege that its

mark FLANAX had been used in the United States,[3] and respondent's motion to

dismiss was denied as moot.[4] In addition to a Section 2(d) claim, the amended

petition also asserted as grounds for cancellation that the registration violated

(1) Article 8 of the General Inter-American Convention for Trademark and

Commercial Protection of Washington, 1929 ("Pan American Convention"), and

(2) Article V of the Convention for the Protection of Commercial, Industrial and

Agricultural Trademarks and Commercial Names of Santiago, 1923 ("Santiago

Convention"). In lieu of a responsive pleading, respondent moved to dismiss the

amended petition, again alleging that petitioner failed to state a claim and lacked

---

[2] This proceeding thus was not subject to the modified disclosure and conferencing regime applicable to inter partes proceedings commenced after November 1, 2007. *See* Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 401 (3d ed. rev. 2 June 2013).

[3] As discussed *infra*, petitioner has not used the FLANAX mark in the United States.

[4] Board Order of September 26, 2007, 10 TTABVUE. Citations to the record include the TTABVUE number of the public (and English-language) entry where available, and, where relevant, to the electronic page number where a cited document or testimony appears.

standing.  The Board granted respondent's motion to dismiss but allowed petitioner

time to replead.[5]  Petitioner filed a second amended pleading.

For a third time, respondent moved to dismiss the amended petition for

failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6).  The Board granted the

motion in part in the precedential decision *Bayer Consumer Care AG v. Belmora

LLC*, 90 USPQ2d 1587 (TTAB 2009).[6]  The four claims in the second amended

petition, and their disposition, were as follows:

1.  Likelihood of confusion under Section 2(d): Dismissed with prejudice

for failure to allege that goods bearing petitioner's FLANAX mark were

manufactured or distributed in the United States prior to respondent's

filing date by petitioner or on its behalf.  *Id.* at 1591.

2.  Violation of Article 6*bis* of the Paris Convention for the Protection of

Industrial Property ("Paris Convention"), as made applicable by

Sections 44(b) and (h) of the Trademark Act: Dismissed with prejudice.

The Board stated that Article 6*bis* does not afford an independent

cause of action for parties in Board proceedings, and that Trademark

Act Section 44 does not "provide the user of an assertedly famous

foreign trademark with an independent basis for cancellation in a

Board proceeding, absent use of the mark in the United States."  *Id.*[7]

---

[5] Board Order of July 29, 2008, 17 TTABVUE.

[6] Board Order of April 6, 2009, 25 TTABVUE.

[7] *Cf. Fiat Group Automobiles S.p.A. v. ISM Inc.*, 94 USPQ2d 1111, 1115 (TTAB 2010) ("We must, however, at least recognize the possibility that, in an unusual case, activity outside

Cancellation No. 92047741

3. <u>Misrepresentation of source under Section 14(3) of the Trademark Act:</u>

Motion to dismiss denied.   The Board found that petitioner had "alleged clearly and specifically that respondent copied petitioner's mark, including its particular display, and virtually all elements of its packaging, in order to 'misrepresent to consumers, including especially consumers familiar with Petitioner's FLANAX mark,' that respondent's product is from the same source as petitioner's product."

*Id.* at 1592.  The claim was therefore sufficiently pled.  Furthermore:

> While respondent argues that petitioner does not have "standing" to bring a misrepresentation of source claim given its failure to allege use in the United States, petitioner has alleged that it is damaged by respondent's use of strikingly similar packaging "to misrepresent the source of" respondent's goods.   This is enough to sufficiently allege petitioner's standing in this proceeding. Although existing case law does not address whether petitioner's alleged use is sufficient to support a claim of misrepresentation of source, we find that at a minimum the claim is pled sufficiently to allow petitioner to argue for the extension of existing law.  Moreover, respondent's focus solely on petitioner's extra-territorial use fails to take account of the fact that respondent's use is in the United States and to the extent such use may be misrepresenting to consumers making purchases in the United States that petitioner is the source of respondent's products, the misrepresentation is alleged by petitioner to be occurring in the United States.   The Lanham Act provides for the protection of consumers as well as the property rights of mark owners.

> *Id.*

---

the United States related to a mark could potentially result in the mark becoming well-known within the United States, even without any form of activity in the United States.").

4. <u>Fraud:</u> Dismissed with prejudice.   Because petitioner did not sufficiently allege prior use of its mark in the United States, it also did not sufficiently allege that it had legal rights superior to respondent's; therefore, petitioner's claim that respondent falsely declared that no other person, firm, corporation, or association had the right to use the FLANAX mark in commerce was untenable.  *Id.* at 1592-93.

Thus, after the Board's order of April 6, 2009, petitioner's only remaining claim was misrepresentation of source pursuant to Trademark Act Section 14(3).

Respondent filed an answer denying petitioner's allegations and asserting several affirmative defenses on June 5, 2009, then moved for summary judgment three months later, asserting that petitioner lacked standing and that respondent had not misrepresented the source of its products as a matter of law.  The Board denied respondent's motion for summary judgment on petitioner's standing and granted petitioner's cross-motion for discovery pursuant to FED. R. CIV. P. 56(f), deferring consideration of respondent's motion for summary judgment on the merits.[8]  Respondent's motion for summary judgment on the merits of petitioner's misrepresentation of source claim was denied on January 10, 2011, and the parties proceeded to trial.[9]

---

[8] Board Order of February 2, 2010, 43 TTABVUE.  The rule governing discovery in response to a summary judgment motion is now found at FED. R. CIV. P. 56(d).

[9] Board Order of January 10, 2011, 60 TTABVUE.  Discussion of various other discovery and trial motions not before us on final decision is omitted.  Also, because respondent did not brief its affirmative defenses as such at trial, they are deemed waived.  *See, e.g., Miller v. Miller*, 105 USPQ2d 1615, 1616 n.3 (TTAB 2013).  However, to the extent they serve to amplify respondent's defense – including its assertion that petitioner lacks standing – they have been considered.

Cancellation No. 92047741

The case is fully briefed, and an oral hearing was held on October 23, 2013.

Evidence and Objections

Each party has moved to strike evidence proffered by the other party. Because of the volume of objections, we address only the objections to the evidence on which the parties relied and that may be relevant to the claim before us. We also discuss only in general terms the portions of the record that the parties have submitted under seal and have not disclosed in their public briefs.

A.    Respondent's Motion to Strike Exhibits to Petitioner's Notice of Reliance[10]

Respondent moves to strike Exhibit B, Parts I and II, to petitioner's notice of reliance, i.e., excerpts from the *Dictionary of Pharmaceutical Specialties of Mexico* and advertisements for Petitioner's FLANAX products from printed publications circulated in Mexico on the basis that they were not shown to be in general circulation in the United States, and also that the advertisements were insufficiently identified and may be made of record only through witness testimony.[11]   Respondent's motion is denied.   The documents are admissible by notice of reliance pursuant to Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e), for petitioner's stated purpose of showing the FLANAX mark and packaging in Mexico. In addition, the sources of the materials in Exhibit B, Part II are sufficiently identified.

---

[10] 90 and 97 TTABVUE; Corrected Appendix 1 to Respondent's Brief, Exhibits A and B, 128 TTABVUE 7-21.

[11] 80 TTABVUE 216-37 and 238-46.

Cancellation No. 92047741

B.   Petitioner's Objections and Motion to Strike Respondent's Evidence[12]

    1.   Counter-Designations from Belcastro Deposition (Exhibit C to Respondent's Amended Notice of Reliance)[13]

Petitioner objects to respondent's proffered counter-designated excerpts from the discovery deposition of respondent's owner, Jamie Belcastro, on the ground that respondent has failed to sufficiently explain why it needs to rely on each additional excerpt.   Respondent does not address its 26 non-consecutive pages of counter-designations individually, but states that they "are offered pursuant to Fed. R. Civ. P. 32(a)(6), which allows an adverse party to offer other parts of a deposition that in fairness should be considered with the parts already introduced," to provide context to the "snippets" of testimony designated by petitioner.[14]

Petitioner's objection is governed by Trademark Rule 2.120(j)(4):[15]

> If only part of a discovery deposition is submitted and made part of the record by a party, an adverse party may introduce under a notice of reliance any other part of the deposition which should in fairness be considered so as to make not misleading what was offered by the submitting party. *A notice of reliance filed by an adverse party must be supported by a written statement explaining why the adverse party needs to rely upon each additional part listed in the adverse party's notice, failing which the Board, in its discretion, may refuse to consider the additional parts.* (emphasis added).

---

[12] 115, 117, and 122 TTABVUE; Appendix to Petitioner's Brief, 125 TTABVUE; Appendix to Petitioner's Reply Brief, 132 TTABVUE.

[13] 112 TTABVUE 87-124.  Respondent also filed an amended notice of reliance, without exhibits, on December 10, 2012.  *See* 116 TTABVUE.

[14] Respondent's notice of reliance, 116 TTABVUE 4-6.

[15] Inter partes proceedings before the Board are governed, in part, by the Federal Rules of Civil Procedure, except as otherwise provided in the Trademark Rules of Practice. Trademark Rule 2.116(a).

Cancellation No. 92047741

We agree with petitioner that respondent's blanket statements fail to explain why respondent needs to rely on each additional proffered excerpt.   Nonetheless, in our discretion, we have reviewed the excerpts and find that each introduces new testimony rather than makes the testimony designated by petitioner not misleading.   We therefore grant petitioner's motion to strike Exhibit C to respondent's notice of reliance.

### 2. Counter-Designations from Belcastro Declaration (Exhibit D to Respondent's Corrected Amended Notice of Reliance)[16]

Petitioner attempted to submit by notice of reliance portions of a declaration by respondent's owner in support of respondent's motion for summary judgment, arguing that these statements from Mr. Belcastro's declaration are admissible as statements by a party-opponent pursuant to FED. R. EVID. 801(d)(2).   Declarations are not among the types of evidence admissible by notice of reliance.   Trademark Rule 2.122(e).   Respondent, however, did not object on this basis, but rather submitted the entire declaration with all exhibits as an exhibit to its own notice of reliance.   Respondent argues that petitioner effectively consented to submission of the full declaration into evidence; failing that, respondent argues that the declaration is admissible in the interests of justice under the "residual" hearsay exception embodied in FED. R. EVID. 807(a).

Because both parties submitted (in whole or in part) Mr. Belcastro's declaration, we deem them to have stipulated the declaration into the record, and

---

[16] 111 TTABVUE 9-67 (redacted).

we hereby consider the entire declaration for whatever evidentiary value it may have and deny petitioner's motion to strike respondent's Exhibit D.

    3.  <u>Testimony of Expert Witness Benjamin L. England</u>[17]

Petitioner objects to the testimony deposition of Benjamin L. England, offered by respondent as an expert witness, because Mr. England was not timely disclosed and did not submit a written report.   Although this case predates the Board's pretrial and expert witness disclosure requirements, petitioner's Interrogatory No. 20 sought disclosure of any expert on whose opinion respondent intended to rely pursuant to FED. R. CIV. P. 26(a)(2)(A) and (B).   Respondent responded during discovery that it "has not yet identified any expert witness that it expects to call to testify on its behalf."[18]

General discovery closed February 9, 2011.   Respondent states that it "determined to elicit Mr. England's testimony only after reviewing the record following the close of Petitioner's testimony period" in response to petitioner's decision not to introduce a paragraph of the Belcastro Declaration.[19]   However, petitioner's testimony period closed on October 14, 2012, and respondent did not identify Mr. England as a potential witness until November 28, 2012,

---

[17] 119-21 TTABVUE.

[18] Annex 1 to Petitioner's Brief, 124 TTABVUE 55 (redacted).   It appears that respondent identified Mr. England in a supplemental answer to Interrogatory No. 20 in the text of an email to petitioner on December 3, 2012, during respondent's testimony period.   Appendix 1 to Respondent's Brief, 127 TTABVUE 51.

[19] Appendix 1 to Respondent's Brief, respondent's opposition to petitioner's objections to its evidence, at 1-2, 127 TTABVUE 3-4.

approximately halfway through its testimony period.[20]  Moreover, petitioner's notice of reliance introducing portions of the Belcastro Declaration was filed more than a year before respondent identified Mr. England, on August 24, 2011.  We also point out that, although respondent states that it identified Mr. England "shortly after he was engaged," Mr. England testified that he was contacted during the first or second week of November 2012 and agreed to testify shortly thereafter, well before he was identified on November 28.[21]

We find that respondent's failure to promptly identify and disclose its expert witness and provide a written report was neither substantially justified nor harmless, and petitioner's objection is sustained.  We therefore strike the England testimony due to untimely disclosure pursuant to FED. R. CIV. P. 37(c)(1).  *See also* Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 414(7) (2d ed. rev. 2004)[22] ("A party need not, in advance of trial, specify in detail the evidence it intends to present, or identify the witnesses it intends to call, except that the names of expert witnesses intended to be called are discoverable."); TBMP § 414(7) & n.13 (3d ed. rev. 2 June 2013) ("For proceedings commenced prior to November 1, 2007, a party need not, in advance of trial, identify the witnesses it intends to call, except that the names of expert witnesses intended to be called are discoverable.").  We point out, however, that the entire Belcastro Declaration has been admitted into evidence, obviating respondent's rationale for the England testimony.

---

[20] *Id.* at 4.

[21] England Transcript at 33:22-34:25, 119 TTABVUE 36-37.

[22] This was the operative edition of the TBMP at the time this proceeding commenced.

Cancellation No. 92047741

### 4. Cross-Examination Testimony of Pascal Bürgin[23]

We sustain petitioner's objections to cross-examination questions six through 57 and Exhibits A through E from the deposition on written questions of petitioner's witness Pascal Bürgin, on the ground that the cross-examination exceeded the scope of the direct examination pursuant to FED. R. EVID. 611(b).

### 5. Exhibits G and H to Respondent's Amended Notice of Reliance[24]

Finally, for the sake of completeness, we note that previous orders of the Board in the same proceeding (including respondent's Exhibit G) are automatically of record. Also, because the document in Exhibit H – displaying respondent's annotations to the operative pleading – is not admissible by notice of reliance, we grant petitioner's motion to strike it.

We hasten to add that consideration of any of the excluded evidence would not have affected the outcome.

## C. Description of the Record

The file of the subject registration for FLANAX is automatically of record. Trademark Rule 2.122(b). Pursuant to the evidentiary rulings *supra*, a summary of the evidence made of record by the parties follows.

### 1. Petitioner's Evidence

Petitioner introduced testimony depositions, with exhibits, of the following six individuals:

---

[23] 109 TTABVUE 9-24 (testimony) and 133-84 (exhibits) (redacted).

[24] 112 TTABVUE 159-77.

Cancellation No. 92047741

- Karla Fernandez Parker, president and CEO of K. Fernandez & Associates, a Hispanic and multicultural marketing and advertising agency in San Antonio, Texas that did work for respondent in 2007;[25]

- Eduardo Gonzalez Machado, a former contractor for K. Fernandez & Associates who performed work for respondent;[26]

- Paul Currao, an account executive of packaging firm Disc Graphics, which produces cartons and labels for respondent;[27]

- Lisa Halprin Fleisher, former global brand director for petitioner's naproxen sodium brands, including FLANAX and ALEVE;[28]

- Pascal Bürgin, head of law and compliance for petitioner, who was deposed on written questions;[29] and

- Juan Jose Bandera, marketing director for Bayer de Mexico, S.A. de C.V.[30]

Petitioner submitted the following evidence by notice of reliance:

- Publications showing the FLANAX mark and packaging in Mexico;[31]

- Printouts from the website of the Department of Homeland Security showing data on numbers of Mexican immigrants to the United States;[32]

- Printouts from websites accessible in the United States, including YouTube.com and Google.com, showing petitioner's FLANAX mark;[33]

---

[25] 78 TTABVUE.

[26] 94 TTABVUE.

[27] 99 TTABVUE (Exhibit 29 filed under seal at 100 TTABVUE 54).

[28] 91 TTABVUE.

[29] 106 and 109 TTABVUE.  Mr. Bürgin's business address is in Basel, Switzerland.

[30] 92 TTABVUE (filed under seal).

[31] Petitioner's Exhibit B, 80 TTABVUE 216-46.

[32] Exhibit C, 80 TTABVUE 247-75.

[33] Petitioner's Exhibit D, 80 TTABVUE 276 to 81 TTABVUE 69.

- Excerpts from pharmacology reference books;[34]

- Printouts from the Aleve.com website and electronic records of the ALEVE trademark registration from the U.S. Patent and Trademark Office database;[35]

- A copy of petitioner's second set of requests for admission and respondent's responses, admitting the authenticity of certain documents produced by respondent in response to petitioner's discovery requests and identified as Exhibits 1 through 420;[36]

- Printouts from the electronic records of the U.S. Patent and Trademark Office showing:

    o the current status and title of respondent's Registration No. 3094431 (DAYAMINERAL);[37]

    o the current status and title of respondent's Registration No. 2712285 (GOYA), and electronic records from the Trademark Trial and Appeal Board concerning Goya Foods, Inc.'s petition to cancel that registration;[38] and

    o the current status and title of respondent's Registration No. 3243061 (ANA-DENT TODO DOLOR);[39]

- A Spanish-language printout from GrupoTeramed.com relating to the analgesic ANA-DENT;[40]

---

[34] Exhibit E, 81 TTABVUE 70-151.

[35] Petitioner's Exhibit F, 81 TTABVUE 152-65.

[36] Exhibit G, 84 TTABVUE 127 through 88 TTABVUE 102 (redacted). It should be noted that, although documents produced in response to document production requests generally cannot be made of record by notice of reliance, *see* Trademark Rule 2.120(j)(3)(ii), serving requests for admission as to the authenticity of the documents on the producing party, and then submitting those admissions by notice of reliance, is a proper way to make the documents of record. *See* TBMP § 704.11(1). We further note that the parties stipulated that these exhibits could be made of record during each party's testimony period by notice of reliance. Although petitioner could make the documents of record pursuant to Trademark Rule 2.120(j)(3)(i) without such a stipulation because they were respondent's responses to petitioner's requests for admission, the stipulation also allowed respondent to submit the responses/documents, even if petitioner had elected not to submit them.

[37] Exhibit H(1), 82 TTABVUE 14-46.

[38] Exhibit H(3), 82 TTABVUE 55-99.

[39] Exhibit H(4), 82 TTABVUE 100-43.

13

- Certain of respondent's responses to petitioner's interrogatories, requests for admission, and requests for production (the latter indicating that no documents responsive to those requests exist);[41]

- Documents showing respondent's FLANAX mark on its goods, including printouts from respondent's current and former websites (FlanaxUSA.com and ElMedicoFlanax.com, respectively) and Facebook page[42] and third-party websites showing respondent's FLANAX products offered for sale;[43]

- Excerpts from the discovery deposition of respondent's owner Jamie Belcastro, with exhibits and errata sheet;[44] and

- Excerpts from a declaration of Mr. Belcastro submitted with respondent's reply in support of its motion for summary judgment on August 10, 2010.[45]

Petitioner also filed a supplemental notice of reliance containing (1) a certified copy of the file for Bayer's Mexican Trademark Registration No. 224,435 for FLANAX, admissible as an official record under Trademark Rule 2.122(e),[46] and (2) printouts from the website of Abbott Laboratories translated from Spanish to English identifying DAYAMINERAL as one of its products offered for sale outside the United States in the Dominican Republic and the Caribbean.[47]

---

[40] Exhibit H(5), 82 TTABVUE 144-45.

[41] Exhibit "I," 88 TTABVUE 235 to 89 TTABVUE 12 (filed under seal).

[42] Exhibit J, 82 TTABVUE 201-39.

[43] Exhibit K, 82 TTABVUE 240-53.

[44] Exhibit L, 89 TTABVUE 76-173 (filed under seal; certain exhibits also at 82 TTABVUE 254-74).

[45] Exhibit M, 89 TTABVUE 174-90 (redacted), the admissibility of which is discussed *supra*.

[46] Exhibit "O," 96 TTABVUE 5-208 (previously submitted as Exhibit A to petitioner's notice of reliance).

[47] Exhibit P, 96 TTABVUE 209-19.

2. <u>Respondent's Evidence</u>

Respondent made the following evidence of record by notice of reliance:

- Certain of petitioner's responses to respondent's interrogatories and requests for admission;[48]

- Declaration of Jamie Belcastro, with exhibits;[49] and

- U.S. Food and Drug Administration regulations regarding labeling of over-the-counter drugs.[50]

Both parties also attempted to introduce samples of packaging for respondent's FLANAX products via notice of reliance. Although product packaging is not among the types of documents admissible by notice of reliance under Trademark Rule 2.122(e), because both parties treated such packaging as being of record, we deem the parties to have stipulated it into the record. We also note that examples of respondent's original and redesigned packaging are in evidence by other means, including as exhibits to the Belcastro Deposition and the Belcastro Declaration.

Parties

Respondent Belmora LLC was formed in 2002 by Virginia pharmacist Jamie Belcastro, its sole employee.[51] Its original product, and the one at issue in this case, is an analgesic tablet containing 220 mg. of naproxen sodium sold over the counter.

---

[48] Exhibit A, 112 TTABVUE 10-61.

[49] Respondent's Exhibit D, 111 TTABVUE 9-67 (redacted), the admissibility of which is discussed *supra*.

[50] Respondent's Exhibit F, 112 TTABVUE 152-58.

[51] Exhibit L, Belcastro Transcript at 18, 89 TTABVUE 89; Exhibit M, Belcastro Decl. ¶ 9, 89 TTABVUE 178.

Cancellation No. 92047741

Respondent began offering this product under the mark FLANAX in 2003 or 2004.[52]

Mr. Belcastro states in part that:

> Belmora's business model is to provide a user-friendly menu of OTC drug products for common ailments to U.S. residents of Hispanic background.  When I refer to Hispanics, I mean persons in the U.S. whose personal or family backgrounds involve either a Spanish-speaking culture or a Spanish-speaking country.[53]

According to Mr. Belcastro, there are more than 48 million Hispanics in the United States, constituting the country's largest and most rapidly growing minority ethnic group.[54]   Respondent's packaging is bilingual, in Spanish and English, and its original website ElMedicoFlanax.com was in Spanish.[55]

Petitioner Bayer Consumer Care AG owns a Mexican registration for the trademark FLANAX for pharmaceutical products, analgesics and anti-inflammatories.[56]   The registration issued to a company named Syntex in 1978 and was renewed November 9, 2003.[57]   Syntex was purchased by Hoffman-la Roche AG

---

[52] The evidence in the trial record does not permit us to make a finding as to the date of first sale.  Respondent's FLANAX Registration, No. 2924440, identifies the date of first use as on or before March 1, 2004.  Some evidence, designated confidential, indicates that marketing began in 2003, while there is other evidence that sales started in "mid-2004." *See also* Respondent's Brief, 126 TTABVUE at 5 (first use in commerce was on or before March 1, 2004), 9 (respondent commenced use of the mark on March 1, 2004); *but see id.* at 4, 24, 25 (indicating that marketing and sales began in mid-2004).

[53] Exhibit M, Belcastro Decl. ¶ 10, 89 TTABVUE 179.

[54] *Id.* at ¶ 12, 89 TTABVUE 180.

[55] *See* Exhibit L, Belcastro Transcript at 21-22, 89 TTABVUE 90-91; *id.*, deposition exhibit 5, 82 TTABVUE 262-66; 82 TTABVUE 206-34 (website printouts).

[56] Bürgin Transcript ¶ 9 and Trial Exhibit 23, 106 TTABVUE 7, 31; *see also* Exhibit O, 96 TTABVUE 5-208.

[57] Bürgin Transcript, Trial Exhibit 23, 106 TTABVUE 38-39.

in 1994, and petitioner took over OTC businesses from Roche in 2005.[58]   The FLANAX registration was assigned from Syntex to petitioner in September 2005.[59]

FLANAX brand analgesic has been sold in Mexico since 1976.[60]   Bayer de Mexico, S.A. de C.V., distributes FLANAX products in Mexico via a licensing agreement with petitioner.[61]   Sales and advertising figures are designated confidential, but petitioner presented evidence that FLANAX is the top-selling pain reliever in Mexico and the number one brand for Bayer de Mexico.[62]   Although the dosages differ from respondent's FLANAX analgesic, petitioner's Mexican FLANAX contains the same active ingredient: naproxen sodium.

Petitioner's FLANAX analgesic is not sold in the United States.   However, an affiliate of petitioner, Bayer Healthcare LLC, sells a naproxen sodium-based analgesic in the United States under the brand name ALEVE.[63]   The same employee of Bayer Healthcare, based in Morristown, New Jersey, was, until eight days before her deposition, global brand director for both the ALEVE product and the FLANAX product in Mexico.[64]

---

[58] *Id.*, ¶¶ 10-11, 106 TTABVUE 7.

[59] *Id.*, Trial Exhibit 23, 106 TTABVUE 41, 45.

[60] Bandera Transcript 8:8-9:3, 92 TTABVUE 12-13.  Respondent's objections to this answer as hearsay and lacking foundation are denied.

[61] Bürgin Transcript ¶¶ 13, 19, 106 TTABVUE 7-8.

[62] Bandera Transcript 12:19-15:9, 92 TTABVUE 16-19; *see also* Petitioner's Brief at 7.

[63] *See* Petitioner's Brief at 9, 125 TTABVUE 14; Fleisher Transcript 4:15-5:23, 91 TTABVUE 7-8; Exhibit F, 81 TTABVUE 152-65.

[64] Fleisher Transcript 7:25-8:24, 91 TTABVUE 11-12.

Cancellation No. 92047741

Analysis

Section 14 of the Trademark Act allows for cancellation of a registration on the Principal Register "by any person who believes that he is or will be damaged . . . by the registration." 15 U.S.C. § 1064.  The party seeking cancellation must prove two elements: (1) that it has standing, and (2) that there are valid grounds for canceling the registration.  *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

A.  Petitioner's Standing

The Federal Circuit has enunciated a liberal threshold for determining standing.  *Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1760 (TTAB 2013).  To establish standing, petitioner must prove that it has a "real interest" in this cancellation proceeding and a "reasonable basis" for its belief in damage.  To prove a "real interest" in this case, petitioner must show that it has a "direct and personal stake" in the outcome herein and is more than a "mere intermeddler."  *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1026-27 (Fed. Cir. 1999).

Respondent has contested petitioner's standing at every stage of this proceeding, including trial.  In its brief, respondent makes several arguments why petitioner allegedly lacks standing to bring this proceeding, grounded in the fact that petitioner does not own a registration for the mark FLANAX in the United States, has not used that mark in this country, and does not plan to use the mark here.  Respondent argues that "[g]oodwill exists only in connection with actual

18

commercial use, and Petitioner admits that it does not conduct business in or earn profits from sales in the U.S."[65]  Respondent contends that:

> In short, the parties' respective uses of the mark are two ships passing in the night: an international border completely walls off their respective spheres of economic activity, and neither party has any motive or intention to sell its product on both sides of that border.  Thus, the territorial principle of U.S. trademark law is dispositive of standing: "Trademark rights under the Lanham Act arise solely out of use of the mark in U.S. commerce." *Person's Co. v. Christman*, 900 F.2d 1565, 1570, [14 USPQ2d 1477] (Fed. Cir. 1990) (citations omitted).[66]

Petitioner, in turn, argues that Section 14 of the Trademark Act imposes no use requirement, distinguishing it (and other provisions of the Trademark Act) from Section 2(d).[67]

As we noted in both *Bayer Consumer Care AG*, 90 USPQ2d at 1592, and the Board's Order of February 2, 2010, respondent's focus solely on *petitioner's* commercial activities within the United States overlooks the fact that *respondent's own use* is in the United States.  Petitioner has established that it owns a registration for the mark FLANAX for pain relievers in Mexico and licenses its corporate affiliate to sell pain relievers containing the active ingredient naproxen sodium under that mark in Mexico.  The registration petitioner seeks to cancel is for the identical mark for identical goods, namely, "Orally ingestible tablets of Naproxen Sodium for use as an analgesic."  Thus, in terms of standing, petitioner has shown that it has an interest in protecting its Mexican FLANAX mark.  If

---

[65] Respondent's Brief at 15, 126 TTABVUE 23.

[66] *Id.*

[67] Petitioner's Reply Brief at 8, 132 TTABVUE 11.

respondent is using the FLANAX mark in the United States to misrepresent to U.S. consumers the source of respondent's products as petitioner's Mexican products, it is petitioner who loses the ability to control its reputation and thus suffers damage. As we will explore in the next section, the record in this case clearly establishes that the reputation of the Mexican FLANAX mark does not stop at the Mexican border.[68] *Cf. Steele v. Bulova Watch Co.*, 344 U.S. 280, 95 USPQ 391, 394 (1952) (stating that infringing goods bearing the BULOVA mark made in Mexico "could well reflect adversely on Bulova Watch Company's trade reputation in markets cultivated by advertising here as well as abroad").

Petitioner therefore is no mere intermeddler, but has a real interest in this proceeding and a reasonable basis for its belief that it is or will be damaged by the registration. Thus, it has satisfied the relatively low threshold to establish its standing. *See Cunningham*, 55 USPQ2d at 1844.

B.    Misrepresentation of Source

A party may, pursuant to Section 14(3) of the Trademark Act, petition to cancel a registration of a mark if the mark "is being used by, or with the permission of, the respondent so as to misrepresent the source of the goods or services on or in connection with which the mark is used." The term "misrepresentation of source," as used in Section 14(3), "refers to situations where it is deliberately misrepresented by or with the consent of the respondent that goods and/or services originate from a

---

[68] This case is thus distinguishable from *Person's Co.*, 14 USPQ2d 1477, on which respondent relies. In that case, the Japanese mark PERSON'S was neither used nor known in the United States: "The Person's Co. had no goodwill in the United States and the 'PERSON'S' mark had no reputation here." *Id.* at 1480.

manufacturer or other entity when in fact those goods and/or services originate from another party." *Osterreichischer Molkerei-und Kasereiverband Registriete GmbH v. Marks & Spencer Ltd.*, 203 USPQ 793, 794 (TTAB 1979); *see also Global Maschinen GmbH v. Global Banking Sys., Inc.*, 227 USPQ 862, 864 n.3 (TTAB 1985).

In order to prevail, petitioner must show that respondent took steps to deliberately pass off its goods as those of petitioner. That is, petitioner must establish "blatant misuse of the mark by respondent in a manner calculated to trade on the goodwill and reputation of petitioner." *Otto Int'l Inc. v. Otto Kern GmbH*, 83 USPQ2d 1861, 1863 (TTAB 2007). *See generally* 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 20:60 (4th ed. 2014); Theodore H. Davis, Jr.*, Cancellation under Section 14(3) for Registrant Misrepresentation of Source*, 85 TRADEMARK REP. 67 (Jan.-Feb. 1995). Thus, in reviewing the record, we look for evidence reflecting respondent's deliberate misrepresentation of the source of its product, "blatant misuse" of the mark, or conduct amounting to the deliberate passing-off of respondent's goods. Willful use of a confusingly similar mark is insufficient. *McDonnell Douglas Corp. v. Nat'l Data Corp.*, 228 USPQ 45, 47 (TTAB 1985).

Although the facts before us present a matter of first impression, they do not present a close case. The preponderance of the evidence before us readily establishes blatant misuse of the FLANAX mark in a manner calculated to trade in the United States on the reputation and goodwill of petitioner's mark created by its use in Mexico.

21

First, we find that respondent was aware that the FLANAX trademark was in use in Mexico in association with naproxen sodium-based analgesics when it adopted the FLANAX mark in the United States. Although most of the facts and arguments on which this finding is based are designated as confidential by respondent, the evidence establishes that Mr. Belcastro asked a graphic designer to create the following document just two months before his discovery deposition on August 18, 2009 – when respondent had been using the FLANAX mark for more than five years – and testified untruthfully about its genesis and role in his adoption of the mark:[69]



---

[69] Exhibit L, Belcastro Transcript Exhibit 4, 82 TTABVUE 261. Mr. Belcastro attempted to significantly alter some of the statements in his six-page errata sheet. Such material changes are impermissible in a testimony deposition before the Board. TBMP § 701.03(n). This, however, was a discovery deposition. Although some courts do not allow witnesses to change their transcripts under FED. R. CIV. P. 30(e) to directly contradict their examination testimony, others do, preferably with the original answers remaining in the record. *See* 8A CHARLES ALAN WRIGHT ET AL., FED. PRAC. & PROC. CIV. § 2118 (3d ed. April 2013). Assuming without deciding that we would allow substantive changes to a discovery deposition transcript, we find Mr. Belcastro's explanations of these misstatements in the errata so lacking in credibility that they only serve to strengthen the conclusion that his discovery deposition testimony was untruthful.

Cancellation No. 92047741

In relevant part, Mr. Belcastro's email instructions to the graphic designer on

June 17, 2009 were as follows:[70]

---

**Subject:**      Urgent Request

---

Hi Dan,

I am giving a presentation on Tuesday and I need a piece of artwork as follows. One pdf file that shows the current Flanax word as it appears in our packaging on the bottom of the file and show it evolving into the word Further Lasting Analgesia Naproxen on the top of the pdf file. Stick with our normal blues and whites and fonts. Don't put your identifiers on the file since I am using it in a presentation.

So it should be something like this:

Further Lasting Analgesia Naproxen

FLANAP

FLANOXEN

FLANXEN

FLANAX

Just show derivatives of the word Flanax from the slogan on the top so it covers a normal page in a pdf file and show different formats and fonts with each derivate.

Please contact me on my cell if you have questions.

Sincerely,
Jamie Belcastro
Belmora LLC

---

Based on this fabricated evidence and additional facts and argument designated as

confidential, we find that respondent knowingly selected the identical mark

FLANAX, used by petitioner's Mexican licensee on naproxen sodium-based

painkillers, for use in the United States on the same type of goods.

Second, the evidence establishes that respondent's initial packaging copied

petitioner's FLANAX logo as used in Mexico (demonstrated *supra* and *infra*, with

white letters progressing from thick to thin) and other elements of petitioner's

Mexican packaging. These include very similar (if not identical) shades of sky blue

and blue-and-white striping along the bottom, approximately as follows, with

---

[70] Exhibit L, 82 TTABVUE 274.

petitioner's packaging on the left and respondent's on the right:



Respondent's packaging changed in 2008,[71] but continued to use the FLANAX mark in the same manner, as shown below:



Respondent thus adopted petitioner's identical source-identifying mark and logo, and a highly similar package design.

Third, perhaps the most important and telling fact that distinguishes this case from a Section 2(d) claim, the evidence shows that respondent's owner and agents repeatedly invoked the reputation of petitioner's FLANAX mark when marketing respondent's FLANAX product in the United States. Although nearly all

---

[71] Respondent's Exhibit D, Belcastro Decl. ¶ 7, 111 TTABVUE 53.

24

Cancellation No. 92047741

of this evidence was filed under seal, the following three examples filed publicly on

the TTABVUE website are representative:

- A brochure in both English and Spanish, with a bullet point titled "***Increase Your Profits***" that states: "For generations, Flanax has been a brand that Latinos have turned to for various common ailments.  Now you too can profit from this highly recognized top-selling brand among Latinos.  Flanax is now made in the U.S. and continues to show record sales growth everywhere it is sold.  Flanax acts as a powerful attraction for Latinos by providing them with products they know, trust and prefer."[72]

- A telemarketing script prepared by Mr. Belcastro stating in part: "I'm with ***Belmora LLC***, we're the direct producers of **FLANAX** in the US.  **FLANAX** is a very well known medical product in the Latino American market, for **FLANAX** is sold successfully in Mexico, Centre [sic] and South America."[73]

- A "sell sheet" often used to solicit orders from retailers, stating in part:  "Flanax products have been used from [sic] many, many years in Mexico, Central and South America.  Flanax products are now being produced in the United States by Belmora LLC."[74]

While respondent argues that these statements are true, we have no doubt

that retail customers and consumers exposed to them would draw the logical

conclusion that respondent's U.S. product is licensed or produced by the source of

the same type of product sold under the FLANAX brand for decades south of the

border.  *Cf. West Fla. Seafood Inc. v. Jet Rests. Inc.*, 31 F.3d 1122, 31 USPQ2d 1660,

1663 (Fed. Cir. 1994) (stating, with respect to establishing prior use, that evidence

should be considered as a whole, "as if each piece of evidence were part of a puzzle");

---

[72] Exhibit L, Exhibits 23 and 24 to Belcastro Transcript, 82 TTABVUE 269-70.  Although the text of this exhibit appears to contain no references to respondent, other versions (filed under seal) do, including to "Belmora, LLC Proud Makers of Flanax."

[73] Exhibit M, Belcastro Declaration ¶ 30, 82 TTABVUE 285.

[74] *See id.*, Belcastro Declaration ¶ 33, 82 TTABVUE 286.

Cancellation No. 92047741

*All England Lawn Tennis Club (Wimbledon) Ltd. v. Creations Aromatiques, Inc.*,
220 USPQ 1069, 1072 (TTAB 1983) (sustaining Section 2(d) refusal for the following



composite mark:           concluding that "purchasers of applicant's cologne would
incorrectly believe that said product was approved by or otherwise associated with
the Wimbledon tennis championships").   Nor do we have any doubt based on the
record that respondent deliberately and intentionally encouraged its customers to
reach such a conclusion.   These documents thus operate as an admission by
respondent that petitioner's mark FLANAX is known among the U.S. retailers and
Hispanic consumers to whom respondent markets its products.  With their repeated
references to the "brand" Flanax, these documents also undercut respondent's
argument that FLANAX is generic for naproxen sodium in Mexico,[75] as too does
petitioner's Mexican trademark registration.

Respondent's statements are consistent with the observations of Eduardo
Gonzalez Machado, a contractor with the K. Fernandez & Associates advertising
agency who researched opinions of distributors on respondent's behalf in 2007.
Mr. Gonzalez Machado testified that the distributors he interviewed were familiar
with petitioner's FLANAX brand and aware of its popularity in Mexico.[76]   When

---

[75] See argument in Respondent's Brief at 26, 126 TTABVUE 34:  "Flanax" in this context is like "aspirin" (which started out as a trademark) or ibuprofen – it identifies for those who previously may have been exposed to it outside the U.S., a <u>type</u> of pain relief product as distinct from other <u>types</u> of analgesics.
[76] *See* Gonzalez Machado Transcript 33:5-17, 36:12-24 and Exhibits 9-11, 94 TTABVUE 36, 39, 116-20.

queried on cross-examination whether any distributors asked him "Who's Belmora?" Mr. Gonzalez Machado testified: "I don't remember getting a question. I think that the – what immediately made the connection was the word Flanax."[77] In fact, one of his questions for the distributors was: "When you visit a new store owner, are they familiar with the brand and with how popular the brand is in Mexico?"[78] As Mr. Gonzalez Machado testified:

> A.    And I also remember saying to myself what a very interesting situation [respondent] has, because apparently this is [a] fantastic product and to get the – to be able to sell this in the United States for the Hispanic market.
>         You have to remember right now we're 50,000,000 people in the United States Hispanics, and 60 percent – over 60 percent of those are from Mexico. Mexican descent. So the potential is huge for any product that relates to Mexico [ ] and that is known by Mexicans.[79]

Respondent argues that because it did not use the name "Bayer" on its packaging or in its marketing efforts, and because its own name "Belmora" was present on its packaging and used in its marketing, it could not have misrepresented the source of its products. We disagree. In denying respondent's motion for summary judgment, the Board found that there was a genuine issue of material fact as to whether respondent's self-identification on its packaging was sufficient to defeat petitioner's misrepresentation of source claim, explaining:

> Indeed, in applying other sections of the Act, even where there are clear disclaimers of nonaffiliation, courts often find that confusion or deception is nevertheless likely.

---

[77] Gonzalez Machado Transcript 73:7-14, 94 TTABVUE 76.

[78] Trial Exhibit 10 to Gonzalez Machado Transcript, 94 TTABVUE 118.

[79] Gonzalez Machado Transcript 17:9-20, 94 TTABVUE 20.

> See, e.g., Audi AG v. D'Amato, 469 F.3d 534, 81 USPQ2d
> 1108, 1116 (6th Cir. 2006); Novartis Consumer Health,
> Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,
> 290 F.3d 578, 62 USPQ2d 1757, 1770 (3d Cir. 2002);
> Charles of the Ritz Group Ltd. v. Quality King Distribs.,
> Inc., 832 F.2d 1317, 4 USPQ2d 1778, 1784 (2d Cir. 1987);
> University of Georgia Athletic Ass'n v. Laite, 756 F.2d
> 1535, 225 USPQ 1122, 1131 (11th Cir. 1985).  Here, of
> course, and by contrast, there is only a self identification
> in relatively small print, without any disclaimer of
> affiliation with petitioner, and respondent cites no
> authority for the proposition that self-identification alone
> is necessarily sufficient to defeat a misrepresentation of
> source claim in circumstances such as these.[80]

"The function of a trademark is to identify a single, albeit anonymous, source

of commercial sponsorship of the goods to which it pertains." Johnson & Johnson v.

E. I. du Pont de Nemours & Co., 181 USPQ 790, 791 (TTAB 1974).  Respondent

therefore need not use the Bayer name to affirmatively misrepresent the source of

its FLANAX-brand products.  Respondent purposely achieved the same result by

not only copying petitioner's mark and logo – and, for several years, significant

aspects of its packaging – but also by repeatedly holding itself out as the source in

the United States of the product sold for decades under the same mark in the

bordering country of Mexico.  We find that respondent's specific acts and conduct

were "aimed at deceiving the public into thinking that [respondent's] goods actually

emanate from petitioner." Otto Int'l Inc., 83 USPQ2d at 1864.[81]

---

[80] Board Order of January 10, 2011, at 7 n.3, 60 TTABVUE 7.

[81] We further note that courts have found that, in certain circumstances, use of a defendant's own name or mark can lead consumers to believe that the defendant is either the successor to or the licensee of the senior mark owner.  See Jacobs v. Beecham, 221 U.S. 263, 272 (1911) (Holmes, J.) ("The statement that the defendant makes [the pills defendant sells using plaintiff's name] does not save the fraud.  That is not what the public would notice or is intended to notice, and, if it did, its natural interpretation would be that the

Cancellation No. 92047741

We have carefully considered all of respondent's arguments and specifically address two others. First, respondent contends that petitioner's claim of misrepresentation was "stale" because respondent changed its packaging shortly before petitioner amended its petition for cancellation to add a misrepresentation of source claim, and also because its marketing is now handled by a third-party distributor. Respondent cites no case law in support of its staleness argument. BLACK'S LAW DICTIONARY (9th ed. 2009) defines a "stale claim" as: "A claim that is barred by the statute of limitations or the defense of laches." The facts of this case do not fall under that definition; neither is at issue here. In addition, we agree with petitioner that because its misrepresentation claim arises from the same conduct as its earlier claim under Section 2(d), respondent had adequate notice of petitioner's objection to its conduct, and the misrepresentation claim relates back to the date of the original pleading, citing *Korody-Colyer Corp. v. Gen. Motors Corp.*, 828 F.2d 1572, 4 USPQ2d 1203, 1205 (Fed. Cir. 1987). In any event, we do not view respondent's continued use of the copied packaging as essential to petitioner's misrepresentation claim. For at least four years, respondent marketed its product in a similar package while deliberately misrepresenting its analgesic as the U.S.

---

defendant had bought the original bus[i]ness out and was carrying it on. It would be unfair, even if we could assume, as we cannot, that the defendant uses the plaintiff's formula for his pills."); *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 176 USPQ 15, 17 (2d Cir. 1972) (Friendly, J.) (noting that use of trade name or house mark on box "does not save the day; a purchaser could well think plaintiff had licensed defendant as a second user and the addition is thus 'an aggravation, and not a justification'" (quoting *Menendez v. Holt*, 128 U.S. 514, 521 (1888))). We think customers could draw the same conclusions here, and note in particular that respondent's marketing material clearly contemplates, and seeks to capitalize on, its targeted consumers' familiarity with and recognition of petitioner's well-known brand in Mexico.

29

version of petitioner's foreign FLANAX product.   Respondent built its business on this heritage of misrepresentation, and petitioner suffers damage today due to respondent's continued use of the identical FLANAX mark on the same type of product, even though its packaging and marketing may have changed.

Finally, respondent argues that its marketing efforts to link its FLANAX product to petitioner's FLANAX product continued only for a limited number of years:  "To be sure, in the beginning limited efforts were made to market to native Spanish speaking U.S. consumers who might have been exposed to 'Flanax' in Mexico."[82]  Yet the evidence does not support a finding that respondent's misleading marketing was limited or short-lived.   The trial record includes numerous instances of respondent's founder, Mr. Belcastro, as well as his agents, deliberately invoking the reputation of petitioner's foreign product to sell his own goods domestically under the same mark during the 2006-2009 time frame.   The record contains insufficient evidence from which we could conclude that respondent did not make such misrepresentations in its marketing before or after these years.[83]   Even if respondent did not, its continued use of the FLANAX mark, coupled with its earlier deceptive marketing over several years as it built its business, constitutes

---

[82] Respondent's Brief at 26, 126 TTABVUE 34.

[83] In 2007, after this proceeding was filed, Mr. Belcastro donated the computer used in his business to charity, and therefore petitioner was prevented from obtaining any requested documents that resided only on that computer.  *See* Board Order of February 16, 2010 at 4 n.3, 45 TTABVUE 5 (noting that respondent does not dispute that, "after petitioner initiated this proceeding, Mr. Belcastro donated an old computer containing relevant information to charity and deleted certain apparently relevant e-mails").

Cancellation No. 92047741

misrepresentation of the source of respondent's goods within the meaning of Section 14(3).

Conclusion

Pursuant to Section 14(3) of the Trademark Act, we find that respondent is using the mark FLANAX so as to misrepresent the source of the goods on which the mark is used.

*Decision*:  The petition to cancel is granted.  Registration No. 2924440 will be cancelled in due course.